IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

SELENE COMMUNICATION )
TECHNOLOGIES, LLC, )
)
    Plaintiff, )
)
v. ) C.A. No. 14-432-LPS
)
FLUKE ELECTRONICS CORPORATION, )
)
    Defendant. )

Richard D. Kirk, Stephen B. Brauerman, Vanessa R. Tiradentes, Sara E. Bussiere, BAYARD, P.A., Wilmington, DE

Mark S. Raskin, Eric P. Berger, John F. Petrsoric, Michael DeVincenzo, Charles Wizenfeld, MISHCON DE REYA NEW YORK LLP, New York, NY

    Attorneys for Plaintiffs


Richard L. Horwitz, David E. Moore, Bindu A. Palapura, POTTER ANDERSON & CORROON LLP, Wilmington, DE

Michael A. Oblon, PERKINS COIE, LLP, Washington, DC

Antoine M. McNamara, PERKINS COIE, LLP, Seattle, WA

    Attorneys for Defendant

**MEMORANDUM OPINION**

August 6, 2015
Wilmington, Delaware

STARK, U.S. District Judge:

## I. BACKGROUND

Plaintiff Selene Communication Technologies, LLC ("Selene" or "Plaintiff") filed a patent infringement action against Defendant Fluke Electronics Corporation ("Fluke" or "Defendant"). (D.I. 1) Selene alleges that Fluke infringes U.S. Patent No. 7,143,444 ("the '444 patent"), entitled "Application-Layer Anomaly and Misuse Detection," a patent which issued on November 28, 2006. (D.I. 1 Ex. A) The patent relates generally to computer network intrusion detection. (*See id.*)

Pending before the Court is the issue of claim construction of various disputed terms of the patent-in-suit. The parties completed briefing on claim construction on June 9, 2015. (D.I. 57, 60, 66, 69) The Court held a claim construction hearing on July 15, 2015. (D.I. 87) ("Tr.") Both parties submitted supplemental authority after the hearing. (D.I. 83, 84)

## II. LEGAL STANDARDS

The ultimate question of the proper construction of a patent is a question of law. *See Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 837 (2015) (citing *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 388-91 (1996)). "It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (internal quotation marks omitted). "[T]here is no magic formula or catechism for conducting claim construction." *Id.* at 1324. Instead, the court is free to attach the appropriate weight to appropriate sources "in light of the statutes and policies that inform patent law." *Id.*

"[T]he words of a claim are generally given their ordinary and customary meaning . . .

1

[which is] the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Id.* at 1312-13 (internal citations and quotation marks omitted). "[T]he ordinary meaning of a claim term is its meaning to the ordinary artisan after reading the entire patent." *Id.* at 1321 (internal quotation marks omitted). The patent specification "is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).

While "the claims themselves provide substantial guidance as to the meaning of particular claim terms," the context of the surrounding words of the claim also must be considered. *Phillips*, 415 F.3d at 1314. Furthermore, "[o]ther claims of the patent in question, both asserted and unasserted, can also be valuable sources of enlightenment . . . [b]ecause claim terms are normally used consistently throughout the patent . . . ." *Id.* (internal citation omitted).

It is likewise true that "[d]ifferences among claims can also be a useful guide . . . . For example, the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim." *Id.* at 1314-15 (internal citation omitted). This "presumption is especially strong when the limitation in dispute is the only meaningful difference between an independent and dependent claim, and one party is urging that the limitation in the dependent claim should be read into the independent claim." *SunRace Roots Enter. Co., Ltd. v. SRAM Corp.*, 336 F.3d 1298, 1303 (Fed. Cir. 2003).

It is also possible that "the specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess. In such cases, the inventor's lexicography governs." *Phillips*, 415 F.3d at 1316. It bears emphasis that "[e]ven

2

when the specification describes only a single embodiment, the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction." *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004) (internal quotation marks omitted), *aff'd*, 481 F.3d 1371 (Fed. Cir. 2007).

In addition to the specification, a court "should also consider the patent's prosecution history, if it is in evidence." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 980 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996). The prosecution history, which is "intrinsic evidence," "consists of the complete record of the proceedings before the PTO [Patent and Trademark Office] and includes the prior art cited during the examination of the patent." *Phillips*, 415 F.3d at 1317. "[T]he prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Id.*

In some cases, "the district court will need to look beyond the patent's intrinsic evidence and to consult extrinsic evidence in order to understand, for example, the background science or the meaning of a term in the relevant art during the relevant time period." *Teva*, 135 S. Ct. at 841. "Extrinsic evidence consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Markman*, 52 F.3d at 980. For instance, technical dictionaries can assist the court in determining the meaning of a term to those of skill in the relevant art because such dictionaries "endeavor to collect the accepted meanings of terms used in various fields of science and technology." *Phillips*, 415 F.3d

3

at 1318. In addition, expert testimony can be useful "to ensure that the court's understanding of the technical aspects of the patent is consistent with that of a person of skill in the art, or to establish that a particular term in the patent or the prior art has a particular meaning in the pertinent field." *Id.* Nonetheless, courts must not lose sight of the fact that "expert reports and testimony [are] generated at the time of and for the purpose of litigation and thus can suffer from bias that is not present in intrinsic evidence." *Id.* Overall, while extrinsic evidence "may be useful" to the court, it is "less reliable" than intrinsic evidence, and its consideration "is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence." *Id.* at 1318-19. Where the intrinsic record unambiguously describes the scope of the patented invention, reliance on any extrinsic evidence is improper. *See Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1308 (Fed. Cir. 1999) (citing *Vitronics*, 90 F.3d at 1583).

Finally, "[t]he construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998). It follows that "a claim interpretation that would exclude the inventor's device is rarely the correct interpretation." *Osram GmbH v. Int'l Trade Comm'n*, 505 F.3d 1351, 1358 (Fed. Cir. 2007) (quoting *Modine Mfg. Co. v. U.S. Int'l Trade Comm'n*, 75 F.3d 1545, 1550 (Fed. Cir. 1996)).

## III. UNDISPUTED TERMS

During the claim construction hearing, the parties reached agreement as to the construction of three terms: Server/server process, intrusion detection process, and analysis process. (*See* Tr. 39-42, 50-51, 109-10) The Court will adopt the agreed-upon constructions.

4

## IV. DISPUTED TERMS

### A. "integrating the intrusion detection process with a server process"

| Selene's Proposal | Fluke's Proposal | Court's Construction |
|---|---|---|
| "Establishing a direct data connection between the intrusion detection process and the server process" | "Making the intrusion detection process and the server process part of the same application"[1] | "Establishing a direct data connection between the intrusion detection process and the server process" |

The parties dispute whether "integrating" the intrusion detection process with a server process requires simply establishing a data connection between the two processes, or whether the intrusion detection process and the server process must be "a part of" the same application.[2] Selene contends that Fluke's proposal would be confusing to a jury as it is unclear what "making" the intrusion detection process "a part of" a server application means. (D.I. 60 at 10) Fluke's proposed construction is based on the description in the specification of the advantages of the invention. (*See, e.g.*, '444 patent, col. 2 ll. 36-39, 56-60, 62-65) (describing advantages of being "part of the application"). Fluke argues that, "The inventors considered this integration to be the key aspect of the purported invention. . . . '[I]ntegrating' requires more than just 'establishing a data connection,' it means that the two components are made part of a single software application." (D.I. 57 at 10)

Selene's proposed construction is based on a statement in the specification which supports its theory for the integration of the intrusion detection process and the server process.

---

[1] Fluke amended its proposal during the claim construction hearing. (Tr. at 52)

[2] Both "server process" and "intrusion detection process" are terms on which the parties agreed to a construction, which leaves only the "integrating . . . with" portion of this claim term remaining for construction by the Court.

5

(*See* '444 patent, col. 1 ll. 41-44) ("Integrating may include defining global application programmer interface (API) structures in the intrusion detection process to establish a connection to an application programmer interface (API) of the server process.") While Fluke argues that this is a specific, out-of-context statement regarding API structures, it is clear that "integrating" may include using those structures to "establish a connection" between the intrusion detection process and the server process. The Court also agrees with Selene that construing "integrating" as Defendant proposes may introduce ambiguity as to what it means for the intrusion detection process to be "a part of" the server process.

On this term, and generally throughout the argument and briefing, Fluke's proposals attempt to limit the invention based on what Fluke interprets to be the distinctions between this invention and the prior art. (*See* D.I. 66 at 1 ("That patent is directed to a particular method of collecting data for intrusion detection analysis by integrating the intrusion detection data collection process with a server application so that it can have unfettered access to the data requests that are received by that server application. The inventors distinguished their approach from other longstanding methods of intrusion detection data collection . . .")) In particular, Fluke relies on a paper by the inventors Almgren & Lindqvist as support for the distinct advantages provided by the "application-integrated" intrusion detection over network-based systems. (*See* D.I. 59-2 Ex. 3 at 5-6)[3] Even if the construction proposed by Selene might be broad enough to encompass the prior network-based systems, that alone is not sufficient to refrain from adopting

---

[3]The Court has found no support in the law for Defendant's contention that a prior publication can inform and limit a claim term where the specification explicitly discloses another embodiment.

6

Selene's proposal.[4]

Simply put, the specification supports both limitations proposed. It repeatedly discloses that the application integrated intrusion process is *part of* the application. (*See* '444 patent col. 2 ll. 35-36, 56-58, 62-65; col. 2 l. 66 - col. 3l. 3; col. 4 ll.14-18) However, it also explicitly discloses, "Integrating may include defining global application programmer interface (API) structures in the intrusion detection process to *establish a connection* to an application programmer interface (API) of the server process." (*Id.* at col. 1 ll. 40-45) (emphasis added) In the Court's view, establishing a connection is the broader proposal, and likely encompasses Fluke's proposal wherein the intrusion detection process and the server process are "part of" the same application. That also means that adopting Fluke's construction would exclude a disclosed limitation from the specification, and instead adopt a "preferred embodiment." This is not the correct result here.

### B. "funneling process"

| Selene's Proposal | Fluke's Proposal | Court's Construction |
|---|---|---|
| "Machine executable instructions that accept information on an incoming connection and pass the information to an outgoing connection" | Indefinite.<br><br>Alternative: "The eFunnel program used to transmit message in an EMERALD framework" | "Process that accepts information on one or more incoming connections and passes the information to one or more outgoing connections" |

---

[4]*See Northrup Grumman Corp. v. Intel Corp.*, 112 F.3d 1146, 1160 (Fed. Cit. 1997) ("Absent a clear disclaimer of particular subject matter, the fact that the inventor may have anticipated that the invention would be used in a particular way does not mean that the scope of the patent is limited to that context."); *see also Ormco Corp. v. Align Tech., Inc.*, 498 F.3d 1307, 1322 (Fed. Cir. 2007) ("This court, however, has rejected a claim construction process based on the 'essence' of an invention.").

7

The parties dispute whether this term is indefinite. Fluke also contends that Selene's proposal is so broad that it "finds no support in the specification, would directly contradict the only arguably relevant passage [in the specification], and would impermissibly read the 'funneling process' term completely out of the claims." (D.I. 57 at 17) The Court finds that Fluke has not come forward with clear and convincing evidence of indefiniteness.

"[A] patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.,* 134 S. Ct. 2120, 2124 (2014). The burden is on Fluke to prove that this claim term is indefinite.

Fluke argues that the term is indefinite since neither the specification nor the expert testimony give any guidance as to what the term "funneling" means,[5] as it is not a term of art recognized in the field. (Tr. 82) The term "funneling" appears multiple times in the written description of the invention, although not in a consistent manner.[6] However, at a broad level, it

---

[5]The parties agreed in the hearing that "process" is a term of art which needs no construction. (Tr. 29, 37)

[6]"The funneling process may include accepting incoming connections to which the subset can be transmitted and passing the subset to outgoing connections" ('444 patent, col. 2 ll. 13-15; *see also id.* at col. 10 ll. 27-31 (dependent claim 7)); "[t]he funneling process may further include duplicating the subset for delivery to a second analysis process" (*id.* at col. 2 ll. 15-17); "[t]he funneling process 56 communicates with the analysis engine 58 that is typically located in an external host and not in the web server 20" (*id.* at col. 9 ll. 11-13); "[t]he funneling process 56, in an Emerald framework, accepts incoming connections where Emerald messages can be transmitted, and passes the information to outgoing connections" (*id.* at ll. 13-16); "[t]he funneling process 56 can duplicate incoming information (having two different analysis engines for the same application) or multiplex several incoming flows into one outgoing connection (comparing the results of a network-based monitor with an application integrated module for discrepancies)" (*id.* at ll. 16-21); "[t]he funneling process 56 takes into account problems that might appear in interprocess communication, such as lost connections or necessary buffering" (*id.* at ll. 20-23).

8

is clear that the funneling process is involved in the delivery of information. (*See, e.g., id.* at 87) The Court agrees with Plaintiff that a person of ordinary skill in the art, given the intrinsic evidence disclosing a funneling process in several different contexts, could reasonably determine what "funneling process" means. (*See, e.g., id.* at 93)

Fluke asserts that funneling process is superfluous since it would be impossible to deliver data from one process to a separate process without falling within the scope of Plaintiff's proposed construction. (*See* D.I. 66 at 10-11) However, it is clear that the "funneling process" may pass information in different ways, including by duplicating and multiplexing information. The inventors chose to use the term broadly in claim 1, and limit it in dependent claims 7 and 8, as they were permitted to do. The construction the Court is adopting encompasses those alternative embodiments and, therefore, is consistent with the specification and also the claim language.[7]

### C. "socket"

| Selene's Proposal | Fluke's Proposal | Court's Construction |
|---|---|---|
| "Connection endpoint" | "A type of inter-process communication in a UNIX operating system environment"<br><br>Or, in the alternative:<br><br>A connection endpoint for an inter-process communication | "Connection endpoint" |

---

[7]Fluke's contention that inventor testimony and expert declaration show the term has no meaning to one of skill in the art are unpersuasive. In light of the intrinsic record, which discloses the meaning of funneling process, the extrinsic evidence does not amount to clear and convincing evidence that the term is indefinite.

The parties dispute whether "socket" should be construed in a broad or limited sense. While Selene proposes the broad construction "connection endpoint," Fluke proposes that a socket be limited to a specific operating environment, or in the alternative, to a connection for an inter-process communication. The Court finds that Fluke's construction is too narrow and not supported by the specification.

Fluke argues that the socket refers only to a specific type of inter-process communication, rather than any type of connection, and that adopting Selene's proposal results in a broad construction which does not take into account the specific limitations which are inherent in the claims. The Court finds that the limitations to which Fluke is referring are already accounted for by the context of the claim language. For instance, a socket is not used for data delivery in all inter-process communications, but is expressly disclosed where the intrusion detection process communicates with the analysis process. (*See, e.g.*, '444 patent, col. 10 ll. 9-13 ("where the intrusion detection process . . . deliver[s] the subset [of information] . . . via a socket, to an analysis process")) This is the specific type of communication process which Fluke proposes the Court import into the claim term "socket," but the Court finds it is unnecessary to do so.

## V. CONCLUSION

An appropriate Order follows.